Charlotte SNOW et al.,
Plaintiffs-Appellees,

v.

CITY OF MEMPHIS et al.,
Defendants-Appellants.

KENMONT APARTMENTS,
Plaintiff-Appellant,

v.

The METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY et al., Defendants-Appellees.

Supreme Court of Tennessee.

April 9, 1975.

Rehearing Denied Sept. 2, 1975.

Martin, Tate, Morrow & Marston, Kriger & Harkavy, Evans, Petree, Cobb & Edwards, Memphis, of counsel, for Charlotte Snow and others.

Thomas V. White, Nashville, for Kenmont Apartments.

John D. Martin, Jr., David C. Porteous, Memphis, for Kenmont Apartments and Charlotte Snow, and others.

Everett H. Falk, Asst. Atty. Gen., Nashville, Frierson M. Graves, Jr., City Atty., J. Minor Tait, Jr., Asst. County Atty., Memphis, for City of Memphis, and others.

Dept. of Law of the Metropolitan Government of Nashville and Davidson County, William F. Howard, Donald L. Corlew, Nashville, for the Metropolitan Government of Nashville and Davidson County, and others.

## OPINION

FONES, Chief Justice.

These two cases were consolidated for oral argument, and will be disposed of in one opinion.

All plaintiffs, except the tenant-plaintiffs, are owners of real property containing two or more rental units used for dwelling

purposes. Such property is defined as commercial property in Article II, Section 28(c) of the Constitution of Tennessee, as a result of the well known and much litigated Question 3 amendment.

Plaintiffs Snow, et al., filed a declaratory judgment action in the Chancery Court of Shelby County, asserting that the Constitutional Convention of 1971 exceeded the limitation of the call and created a fifth classification of real property when it defined residential property containing two or more rental units as commercial property. An adjudication declaring said amendment unconstitutional, as violative of Article XI, Section 3, Tennessee Constitution and the 14th Amendment, U. S. Constitution, was sought. From a decree sustaining plaintiff's contention, the City of Memphis, the County of Shelby, and the Attorney General of Tennessee, perfected a direct appeal to this Court.

Kenmont Apartments filed a similar action in the Chancery Court of Davidson County, and prosecutes in this Court an appeal from a decree holding said definition, of residential property, constitutional.

All plaintiffs further contend that the treatment of residential property containing two or more rental units as commercial property violates the equal protection clause of the 14th Amendment to the Federal Constitution.

Article II, Section 28 of the Constitution of Tennessee was amended, in compliance with the second method prescribed in Article XI, Section 3 of said Constitution. The process was initiated by the Legislature's enacting Chapter 421, as amended by Chapter 597, Public Acts 1968. Said legislation submitted five questions to the electorate; only one of which, Question 3, received approval of the majority of the voters, in November, 1968.

The Question 3 call is set out in its entirety in Appendix A. The call provides, in affirmative terms, that Article II, Section 28 of the Constitution shall require the classification of property into three classes, real property, intangible personal property, and tangible personal property, and that the Convention shall classify real property *only* into four sub-classifications, (a) public utility, (b) industrial and commercial, (c) residential, and (d) farm.

Delegates were elected to a Constitutional Convention in August, 1970, and in August, 1971 the Convention convened for the purpose of altering and reforming Article II, Section 28 of the Constitution of Tennessee, pursuant to the Question 3 call.

On September 14, 1971, the Convention adopted Resolution 74, which was approved by the voters in August, 1972.

Resolution 74, now Article II, Section 28 of the Constitution of Tennessee (see Appendix B), in setting out the classification of residential property, added the following: ". . . provided that residential property containing two (2) or more rental units is hereby defined as industrial and commercial property."

This action of the Convention is said by the property owners to create a fifth sub-classification of real property beyond the limits of the call, in violation of Article XI, Section 3 of our Constitution.

In the Shelby County case, the learned Chancellor agreed with plaintiffs. He reasoned that, although the amendment as framed by the Convention was approved by the people, the people *first approved the call* limiting the sub-classification of real property to four specific categories, and the post-Convention approval of the people could not legitimate action, illegal in its inception; that the Convention created another sub-classification, to wit, income-producing rental units; that the number of occupants provided no basis of classification and that said action was "purely revenue producing". In finding the provision discriminatory, the Chancellor observed a taxpayer owning two or more rental units is liable for a greater tax proportionally than the owner of only one unit; that the units could be identical in value, location, and

otherwise the same insofar as T.C.A. § 67–606 (basis of evaluation) is concerned, but one taxpayer pays a tax based on 40% of actual value and the other 25% thereof. Reliance was evidently placed upon *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1935), and *Gowens v. City of Bakersfield,* 179 Cal.App.2d 282, 3 Cal.Rptr. 746 (1960).

In the Kenmont Apartments case, the learned Chancellor entered a decree upholding the constitutionality of the amendment to Article II, Section 28 of the Constitution, but did not file a memorandum opinion, as the case was heard just prior to the expiration of his term.

■ In both cases the plaintiffs presented evidence bearing upon the economic and sociological effects of taxing residential rental property at 40% of its value, as compared to taxing residential property at 25%. In both cases, the defendant taxing authorities presented countervailing evidence. The Memphis Chancellor held that all of the evidence was inadmissible, including the Journal of the Limited Constitutional Convention of 1971. We disagree. Some of the evidence introduced in both cases was admissible on the 14th Amendment issue. The Journal of a Constitutional Convention is admissible and the Court may, sua sponte, make use of a journal of proceedings of constitutional conventions when an issue presented makes such use relevant. See *State v. Cloksey,* 37 Tenn. 482 (1858), and *Shelby County v. Hale,* 200 Tenn. 503, 292 S.W.2d 745 (1956). However, the posture of this case, and the view we take, makes it unnecessary to separate the admissible evidence from the inadmissible evidence.

Excellent briefs on behalf of every party to this litigation have been filed, including an amicus curiae brief on behalf of the Tennessee Municipal League and the Tennessee County Services Association, and every persuasive argument, pro and con, has been urged upon us, with superior advocacy.

Numerous definitions of the term "residential property" are cited. The word "residential" and thus the phrase "residential property" is elastic and flexible. The phrase may have different connotations in different statutes and situations. When used in connection with zoning, it has meaning in the light and purpose of zoning laws. When used in connection with taxation, it has, or may have, a different meaning, because the object or purpose of said law is entirely different. In the real estate business, the definition of residential property varies between property managers, builders, and lenders. The issue presented in this case cannot be resolved by the selection of one of the definitions of residential property tendered us in the briefs.

Likewise, the decision in this case cannot be predicated upon whether or not the Constitutional Convention created a fifth *subclassification,* as vigorously contended by the plaintiffs, or whether or not the Convention merely *defined* residential property as asserted by defendants, with equal vigor.

The first issue presented by the plaintiffs' attack on the constitutionality of taxing two or more rental units as commercial property depends upon the proper interpretation and application of the phrase in Article XI, Section 3 of our Constitution, proscribing that no amendment shall become effective, "unless within the limitations of the call of the convention." That phrase has been before this Court for interpretation in connection with the Question 3 call in three prior cases.

The Question 3 call is substantially different from any prior call of a limited constitutional convention.[1] Its departure from the tenor of prior calls provided the issue in *Illustration Design Group v. McCanless,* 224

---

1. Compare Appendix A with the three prior calls of limited constitutional conventions in Appendices C, D and E. The first legislative call of a limited constitutional convention was in 1949 and the first limited constitutional convention in this state's history convened in 1953.

Tenn. 284, 454 S.W.2d 115 (1970). That suit was brought after approval by the people of the Question 3 call in November, 1968, and before the election of the delegates to the Convention in August, 1970. Plaintiffs asserted that Chapter 421 of Public Acts of 1968, as amended was unconstitutional because the Legislature had exceeded the limits of its power in drafting the call, by undertaking to dictate the specific terms of the amendment, thus usurping the function of the Constitutional Convention. In rejecting that contention, the Court said, inter alia,

"It will be observed that, by the provision of the Constitution above quoted (Art. 11, sec. 3, par. 2), the people have not only delegated authority to the Legislature to propose the call for a convention, and thus limit and define the scope and action of such convention, but they have expressly limited the consideration and action of the convention to the proposals already approved by a vote of the people and within the limits of the call, by this language:

' * * * and the convention shall assemble for the consideration of *such proposals as shall have received a favorable vote in said election,* . . .'" 454 S.W.2d 120.

The Court appears to place a great deal of emphasis on the effect of the language, "unless within the limitations of the call." Its holding has been urged upon this Court in three subsequent lawsuits, including this one, as demanding a literal interpretation of that phrase with the result that it is said a constitutional convention must confine its deliberations and actions strictly within the detailed terms of the call. Said cases are *Southern Railway Company v. Dunn,* 483. S.W.2d 101 (Tenn.1972), and *Southern Railway Company v. Fowler,* 497 S.W.2d 891 (Tenn.1973).

In *Fowler,* the plaintiffs contended that the Constitutional Convention exceeded the limitations of the call by sub-classifying tangible personal property, and in authoriz-ing the Legislature to sub-classify intangible personal property. The case was tried in the Chancery Court of Davidson County and then Chancellor Drowota, now a member of the Court of Appeals, filed a Memorandum opinion containing these incisive observations with respect to *Illustration Design Group v. McCanless,* supra:

"This present litigation has revealed at least two adverse effects of the *Illustration Design Group* holding. The first is a very practical concern. That is, *Illustration Design Group* invites litigation like these present suits after every effort to amend the Constitution by the Convention method. Having granted the Legislature power to, in effect, draft proposed amendments, the Legislature can be expected to use that power to the fullest possible extent. The Constitutional Convention in the exercise of its discretion may frequently change or amend the Legislature's draft amendment (the Call). Assuming ratification, it can be safely predicted that opponents of the amendment will consistently bring suits like the present seeking to invalidate the ratified proposal on grounds that the Constitutional Convention exceeded the scope of its authority as defined by the Call.

The second adverse effect, apparent from this present experience, is of constitutional significance. Stated simply, permitting the Legislature to draft every detail of a proposed constitutional amendment, and then requiring the Convention to adhere strictly to (*i. e.* rubber-stamp) the Legislature's product, effectively emasculates the Convention as an institution of constitutional dignity. It removes from the Convention all discretion in framing changes in the fundamental law of this State.

As conceived by Article XI, Section 3, Constitution of Tennessee, the Constitutional Convention in its sphere of authority is an institution of at least equal dignity with the Legislature. The holding of *Illustration Design Group* makes the Constitutional Convention a puppet of the

Legislature. It deprives the Convention of all significance as a constitutional institution."

It is apparent to this Court that such restrictions upon the function of a limited Constitutional Convention are contrary to the intent of the 1953 convention, and to legal and historical precedent in framing constitutional law in Tennessee and our sister states.

The issue thus presented, is of great significance in the fundamental law of this State and must be clarified.

A brief review .of the background and events leading directly to the amendment of the second paragraph of Article XI, Section 3 of our Constitution, dealing with the Convention method of amendment, is appropriate.

The pre-amended provision as it appeared in our 1870 Constitution, with respect to amending by the Convention method, provided as follows:

"The Legislature shall have the right, at any time by law, to submit to the people the question of calling a Convention to alter, reform or abolish this Constitution, and when upon such submission, a majority of all the votes cast shall be in favor of said proposition, then delegates shall be chosen, and the Convention shall assemble in such mode and manner as shall be prescribed."

By Senate Joint Resolution No. 20, Public Acts of 1945, the Legislature authorized and directed the Governor to appoint a Constitution Revision Commission. The purpose of the Commission was to make a study of the needs for revision of the Constitution of Tennessee and present its recommendations to the 1947 Session of the General Assembly. Seven distinguished lawyers were appointed by the Governor and, after more than a year of study, the Commission's report was submitted to the 75th General Assembly. on November 8, 1946.

Said Commission recommended that nine sections of the Constitution be changed and devoted much of its report to the procedure best calculated to bring about the suggested changes. Eleven efforts to amend the 1870 Constitution by the legislative method had failed because of the obstacle of obtaining voter ratification by a majority of all those voting for representatives.[2] We judicially note, that in said efforts to amend by that process, only a small percentage of the voters who voted for representatives cast their ballots either for or against constitutional amendments, leaving the required majority of those voting for representatives, unattainable. After a careful study of the authorities, said Commission reached the conclusion that a limited constitutional convention was authorized by the above quoted Convention method contained in the 1870 Constitution, but an opinion from the Attorney General was requested. (Report of Constitution Revision Commission, pp. 2–8).

Attorney General Beeler rendered the requested opinion on May 16, 1946, finding a limited Constitutional Convention invalid and unconstitutional. Of significance to our inquiry is the following excerpt from his opinion:

"The last sentence of Art. 11, Sec. 3, is the one using the wording 'to alter, reform or abolish.' This sentence and these words do not confer upon the Legislature the power or authority to limit the Constitutional Convention to a consideration of any particular amendments; *but a Constitutional Convention once called and assembled is sovereign in character and must be left free to either 'alter, reform or abolish' the existing Constitution.* To hold otherwise would be to reduce the Constitutional Convention to nothing more nor less than a rubber stamp. Its members would be shackled and manacled . . . in common, every day lan-

2. "—And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the State voting for Representatives, voting in their favor,—" Article 11, Section 3, Constitution of 1870.

guage 'hamstrung' and 'hogtied.' The framers of this constitutional provision intended to provide the State with the benefit of the collective coordinate judgment of the individual members making up the Constitutional Convention and it was not intended that the Legislature by a limiting Act could short-circuit the Constitutional Convention by *the submission* to it of certain specific amendments. To hold otherwise would be to reduce the Convention to a servile agency of State Government." (Emphasis supplied).[3]

As a direct result of the Attorney General's opinion, the report of the Constitution Revision Commission and the enactment of Chapter 49, Public Acts of 1949, calling a limited Constitutional Convention to consider the nine changes recommended by said Commission, the landmark case of *Cummings v. Beeler,* 189 Tenn. 151, 223 S.W.2d 913 (1949), was filed.

The suit was brought by Cummings in his official capacity as Secretary of State, seeking a declaratory judgment as to the constitutionality of Chapter 49 of the Public Acts of 1949, for the immediate purpose of determining whether or not the Secretary of State should expend public funds for the holding of the special election on November 8, 1949, submitting the question of calling the limited Constitutional Convention. The court observed that it must be conceded that authority is granted to the Legislature to propose to the people a call of a convention to alter, reform or abolish the Constitution as a *whole* ; that the question to be determined was whether or not the call could *limit* the convention to amending the Constitution *in part.* 223 S.W.2d, at 921. In upholding the 1949 Act and establishing the limited constitutional convention as a political entity, Justice Burnett, writing for the Court, said:

"The power to 'alter, reform or abolish' the Tennessee Constitution resides in the people not in the Legislature. . . .

The people have the ultimate power to control and alter their Constitution, subject only to such limitations and restraints as may be imposed by the Constitution of the United States.

\* \* \* \* \* \*

The Constitutional provision above quoted does not prohibit the revision or amendment of *a part* of the Constitution by the Convention method. . . . The thing that the people call a Convention for is not to revise or to write a new Constitution but *only a part* thereof. The people having thus voted to circumscribe the limits of their elected Convention delegates, in the particulars as provided for in the Act, bind these delegates within these limits." (Emphasis supplied). 223 S.W.2d, at 923.

An examination of the call portion of Chapter 49, Public Acts of 1949, at issue before the Court in *Cummings,* reveal that the *parts* of the Constitution proposed to be submitted for Convention consideration are described only by article and section number and the subject matter of the section.

The 1949 call for a Constitutional Convention was rejected by the voters. The 1953 Constitutional Convention was called by Chapter 130, Public Acts of 1951, and approved by the people at the election held on August 7, 1952. Said call omitted three issues that were included in the 1949 call and designated the six issues submitted by article and section number and subject matter.

One of the six issues before the Convention was Article XI, Section 3. As amended by that Convention and ratified by the people, the Convention method of our Constitution reads as follows:

"The Legislature shall have the right by law to submit to the people, at any <u>general election,</u> the question of calling a convention to alter, reform, or abolish this

---

**3.** Among the cases relied upon by Attorney General Beeler in reaching the foregoing conclusion were: *Carton v. Sec. of State,* 151 Mich. 337, 115 N.W. 429; *Goodrich v. Moore,* 2 Minn. 61, Gil. 49; *Sproule v. Fredericks,* 69 Miss. 898, 11 So. 472.

Constitution, <u>or to alter, reform or abolish any specified part or parts of it</u>; and when, upon such submission, a majority of all the voters voting upon the proposal submitted shall approve the proposal to call a convention, the delegates to such convention shall be chosen at the next general election and the convention shall assemble for the consideration of such proposals as shall have received a favorable vote in said election, in such mode and manner as shall be prescribed. <u>No change in, or amendment to, this Constitution proposed by such convention shall become effective, unless within the limitations of the call of the convention, and unless approved and ratified by a majority of the qualified voters voting separately on such change or amendment at an election to be held in such manner and on such date as may be fixed by the convention. No such convention shall be held oftener than once in six years.</u>"

■ The additions to the 1870 section (underlined above), dealing with the Convention method, provide explicit authorization for a limited constitutional convention. We have carefully examined the Journal of the Constitutional Convention of 1953 and it is abundantly clear that the purpose in adding the additional language that now appears in said paragraph, including the phrase "within the limitation of the call" was to confirm in the amending clause of the Constitution, the holding in *Cummings v. Beeler,* legalizing the political entity known as a limited constitutional convention, to make it mandatory that the work product of the Convention be submitted for ratification or rejection by the people, and to limit conventions to one in six years. The proponents of the amendment so stated, and the opponents of the amendment, expressed complete confidence in the efficacy of *Cummings v. Beeler,* supra, as firmly establishing the limited constitutional convention, and considered any amendment to the Convention method to be unnecessary. Journal of Proceedings of Tennessee Limited Constitutional Convention, 1953, pp. 239, 763, 781–784.

The Constitution Revision Commission, the Supreme Court and, finally, the Limited Constitutional Convention of 1953, implicitly, if not explicitly, envisioned as the only limitaton upon a constitutional convention the restriction of its deliberations to a particular section and the subject matter of that section of the Constitution; that a convention could be limited to a *part* of the Constitution, whereas, theretofore there was respectable opinion, including the Attorney General, that it could not be limited in any manner whatsoever.

We are convinced that it was never conceived that within the specified section and the subject matter thereof any further or additional restrictions would or could be placed upon a constitutional convention.

■ Accordingly, we hold that any restrictions in the call, exceeding a recitation of the subject matter of the existing section designated for consideration, are not binding upon the Convention, and the Convention is free to abolish, or to alter or amend the section to such extent and in such manner as it deems proper. If the Legislature, as the agent of the people, desires to submit to the people the question of calling a Constitutional Convention to consider new subject matter, not embraced in the Constitution, it, of course, may do so by an appropriate description of such subject matter, corresponding to the descriptive format used to describe the subject matter of existing Constitutional sections in the 1949, 1951, and 1962 calls. To the extent that the legislature includes affirmative proposals in the call, beyond the scope aforesaid, the excess is mere surplusage, in the nature of gratuitous advice, and even though approved by the people, is not binding on the Convention, nor does it invalidate the call or the subsequent action of the Convention.

■ It must be remembered that the Convention method, whether limited or unlimited, is subjected to two votes by the people, the ultimate repository of all power.

The primary purpose of the call vote is to determine whether or not the people are willing to *permit* a convention to *consider* altering, amending or abolishing the whole Constitution, or specified parts thereof. An affirmative vote for a convention, for limited or unlimited purposes, is a grant by the people to a historic deliberative body to write constitutional, fundamental law as distinguished from statutory law. Imperfection in the call, such as affirmative proposals exceeding the limits heretofore defined, does not invalidate the amending process. The second vote ratifies or rejects the word for word end result of the Convention's deliberative effort. The final validating step by the people is the most significant action in the entire amending process.

■ The courts must indulge every reasonable presumption of law and fact in favor of the validity of a constitutional amendment, after it has been ratified by the people. *Southern Railway Co. v. Fowler*, 497 S.W.2d 891, (Tenn.1973); *People v. Sours*, 31 Colo. 369, 74 P. 167 (1903); *State v. Alderson*, 49 Mont. 387, 142 P. 210 (1914); *Weeks v. Ruff*, 164 S.C. 398, 162 S.E. 450 (1932); *State ex rel. Morgan v. O'Brien*, 134 W.Va. 1, 60 S.E.2d 722 (1948).

■ Applying the foregoing principles to the instant case, we do not interpret the Question 3 call as prohibiting the definition of residential rental property containing two or more rental units, as commercial property.

The other issue asserted by plaintiffs is that the definition under attack violates the equal protection clause of the 14th Amendment, U. S. Constitution. It is said that a discrimination between residential property containing two or more rental units is palpably arbitrary, unreasonable and invidious and bears no rational relationship to any purpose for which it could have been created.

More specifically, it is earnestly insisted that rented single-family residences and duplexes occupied one-half by the owner enjoy the 25% assessment ratio, while an identical duplex with both sides rented and all multiunit apartments, hotels, etc. are assessed at 40%.

The applicable principles often enumerated by the Supreme Court of the United States are stated in *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959), as follows:

". . . The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value. (Citations omitted.) 'To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to assure.' *Ohio Oil Co. v. Conway*, supra, 281 U.S. [146] at page 159, 50 S.Ct. [310] at page 314 [74 L.Ed. 775].

"But there is a point beyond which the State cannot go without violating the Equal Protection Clause. The State must proceed upon a rational basis and may not resort to a classification that is palpa-

bly arbitrary. The rule often has been stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.' (Citations omitted.) 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' *Brown-Forman Co. v. Commonwealth of Kentucky*, 217 U.S. 563, 573, 30 S.Ct. 578, 580, 54 L.Ed. 883. *State Board of Tax Com'rs of Indiana v. Jackson*, 283 U.S. 527, 537, 51 S.Ct. 540, 543, 75 L.Ed. 1248. That a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy." (Citations omitted.)

In *Allied*, the Court was asked by a resident taxpayer who had merchandise stored in four Ohio warehouses to declare unconstitutional an Ohio statute taxing said goods, because of an exemption provided for non-resident owners storing merchandise. Addressing the issue presented by that discriminatory statute, the Court said:

". . . Similarly, it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. (Citations omitted.)

"In the light of the law thus well settled, how stands appellant's case? We cannot assume that state legislative enactments were adopted arbitrarily or without good reason to further some legitimate policy of the State. What were the special reasons, motives or policies of the Ohio Legislature for adopting the questioned proviso we do not know with certainty, nor is it important that we should, *Southwestern Oil Co. v. State of Texas*, 217 U.S. 114, 126, 30 S.Ct. 496, 500, 54 L.Ed. 688, for a state legislature need not explicitly declare its purpose. But it is obvious that it may reasonably have been the purpose and policy of the State Legislature, in adopting the proviso, to encourage the construction or leasing and operation of warehouses in Ohio by nonresidents with the attendant benefits to the State's economy, or to stimulate the market for merchandise and agricultural products produced in Ohio by enabling nonresidents to purchase and hold them in the State for storage only, free from taxes, in anticipation of future needs. Other similar purposes reasonably may be conceived. Therefore, we cannot say that the discrimination of the proviso which exempted only the 'merchandise or agricultural products belonging to a nonresident * * * if held in a storage warehouse for storage only' was not founded upon a reasonable distinction, or difference in state policy, or that no state of facts reasonably can be conceived to sustain it. For those reasons, it cannot be said in the light of the settled law as shown by the cases cited, that the questioned proviso was invidious or palpably arbitrary and denied appellant the equal protection of the laws within the meaning of the Fourteenth Amendment."

More recently in *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973), that Court had under consideration an ad valorem tax exempting the personal property owned by individuals but retaining the taxation of personal property owned by corporations. Mr. Justice Douglas, writing for the Court, quotes from *Allied*, and reaffirms the test as follows:

"In that case we used the phrase 'palpably arbitrary' or 'invidious' as defining the limits placed by the Equal Protection Clause on state power. *Id.*, 358 U.S. at 530, 79 S.Ct., at 442 . . ."

The history of real property taxation in this state, and the amendment itself, leaves no doubt whatever as to the purpose and objective of Article II, Section 28. As shown by the proof in *Louisville & Nashville R. R. v. Public Service Commission*,

D.C., 249 F.Supp. 894 (1966), *affirm'd* 389 F.2d 247 (6th Cir. 1968), the railroad's property was being assessed in the counties of Tennessee in which it operated at not less than 55% of actual cash value, while other real property was being assessed at a statewide average of not more than 30%. In fact, according to proof in that case, properties other than utilities were being assessed in some counties as low as 7%, and in 22 counties the assessment was below 15%. The District Court and the Sixth Circuit held that practice to be in violation of the equal protection clause of the 14th Amendment.

In *Southern Railway Company v. Clement*, 57 Tenn.App. 54, 415 S.W.2d 146 (1967), the Chancellor and the Court of Appeals made it clear that in its pre-amendment status Article II, Section 28 provided no basis for the assessment of any species of property at less than its actual cash value. This Court denied certiorari in May, 1967. It is a matter of common knowledge that these two cases and the report of the Tax Study Commission created by legislative act in 1966 precipitated the amendment of Article II, Section 28, which was accomplished by the process known as Question 3.

The purpose and objective of the Question 3 amendment is to tax income-producing property at a higher rate than owner-occupied residences and farms. That such classification is constitutionally permissible is beyond question. The constitutional and statutory scheme that has resulted from the Question 3 amendment has brought about a state of uniformity and equality of assessment of real property in Tennessee that while not perfect can conservatively be described as vastly superior to its predecessor system in approaching the objective of equality and uniformity throughout the state within the classifications provided. Perfection in the taxation of real property is neither required nor attainable.

With respect to the immediate issue before this Court, it is clear that there is discrimination in favor of the real property owner who lives in one-half of a duplex and rents the other half and in favor of the real property owner who rents one or more single-family residences. There is substantial proof in the Nashville case that single-family residences for rental purposes make a poor investment. The cost of land on the one hand and the savings to be effected in the construction and operation of multi-unit apartments render it inconceivable that any investor would be in the business of renting single-family residences. It is obvious that the Convention and the people deemed it reasonable to embrace within the favored classification of a owner-occupied residence, owners of additional single-family residences and the owner who lives in one-half of his duplex. On the proof and upon conditions of which this Court can take judicial knowledge, the two areas of discrimination mentioned above are, in our opinion, minimal and insignificant and wholly fail to make out a case of palpably arbitrary or invidious discrimination and are therefore within constitutionally permissible limits.

It follows that the statutes under attack herein, implementing Article II, Section 28, are constitutionally sound.

The foregoing opinion renders unnecessary any consideration of the issues raised on appeal by the Memphis tenant-plaintiffs.

The decree of the Chancery Court of Shelby County is reversed. Article II, Section 28, is declared by this Court to be constitutional and the decree of the Chancery Court of Davidson County is affirmed.

The costs are assessed against the plaintiffs in each case.

COOPER, HENRY and BROCK, JJ., concur.

HARBISON, J., not participating.

### APPENDIX A

(The call to be printed in full on each ballot or voting machine as provided in Chapter 421, Public Acts, 1968 [as amended])

"Question 3. Shall a convention be called to alter and reform Article II, Section 28 of the Constitution so as to require the classification of property into three classes for purposes of taxation, to wit:

> Real Property
> Intangible Personal Property
> Tangible Personal Property

Provided that said Convention shall classify Real Property only into four (4) subclassifications, to wit:

(a) Public Utility Property, to be assessed at not less than 45 per cent or more than 55 per cent of its value, the exact percentage to be fixed by the convention.

(b) Industrial and Commercial Property, to be assessed at not less than 35 per cent or more than 45 per cent of its value, the exact percentage to be fixed by the convention;

(c) Residential Property, to be assessed at not less than 25 per cent or more than 35 per cent of its value, the exact percentage to be fixed by the convention; and

(d) Farm Property, to be assessed at not less than 20 per cent or more than 25 per cent of its value, the exact percentage to be fixed by the convention.

Exemption of Tangible Personal Property. Said convention shall further provide and establish an exemption, which shall cover a taxpayer's personal household goods and furnishings, wearing apparel and other such tangible property, the total of which exemption shall not be less than $5,000.00 or more than $7,500.00, as shall be determined by the Convention.

Exemption of Intangible Personal Property. The Convention shall further provide that money deposited in an individual's personal or family checking or savings account shall be exempt from taxes, in an amount to be determined by the convention.

No exemption other than those specified herein shall be authorized by the Convention in the case of either tangible personal property or intangible personal property.

The ratio of assessment to value of property in each class or sub-class, as shall be established by the convention, shall be equal and uniform throughout the State, and each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.

Said Constitutional Convention, if called, shall not be authorized to amend the Constitution so as to permit a personal income tax, except as already authorized under the present Constitution; and the said Convention, if called, may consider the further provisions of Article 2, Section 28, but no action taken shall be in conflict with the provisions hereof."

---

APPENDIX B

"PROPOSAL: RELATIVE TO THE REVISION OF ARTICLE II, SECTION 28, OF THE CONSTITUTION OF TENNESSEE, PROVIDING FOR THE DELETION OF THE PRESENT SECTION AND SUBSTITUTING IN LIEU THEREOF A SECTION PROVIDING FOR THE CLASSIFICATION OF REAL PROPERTY AND TANGIBLE AND INTANGIBLE PERSONAL PROPERTY AND PROVIDING FOR EXEMPTIONS OF CERTAIN REAL PROPERTY, TANGIBLE PERSONAL PROPERTY AND INTANGIBLE PERSONAL PROPERTY.

Be It Resolved, By the Limited Constitutional Convention of 1971 that Article II, Section 28, of the Constitution of the State of Tennessee be amended by deleting the same in its entirety and substituting in lieu thereof the following provisions, to be submitted to a vote of the people for ratification:

In accordance with the following provisions, all property real, personal or mixed shall be subject to taxation, but the Legislature may except such as may be held by the State, by Counties, Cities or Towns, and

used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational, and shall except the direct product of the soil in the hands of the producer, and his immediate vendee, and the entire amount of money deposited in an individual's personal or family checking or savings accounts. For purposes of taxation, property shall be classified into three classes, to wit: Real Property, Tangible Personal Property and Intangible Personal Property.

Real Property shall be classified into four (4) subclassifications and assessed as follows:

(a) Public Utility Property, to be assessed at fifty-five (55%) per cent of its value;

(b) Industrial and Commercial Property, to be assessed at forty (40%) per cent of its value;

(c) Residential Property, to be assessed at twenty-five (25%) per cent of its value, provided that residential property containing two (2) or more rental units is hereby defined as industrial and commercial property; and

(d) Farm Property, to be assessed at twenty-five (25%) per cent of its value.

House trailers, mobile homes, and all other similar movable structures used for commercial, industrial, or residential purposes shall be assessed as Real Property as an improvement to the land where located.

The Legislature shall provide tax relief to elderly low-income taxpayers through payments by the State to reimburse all or part of the taxes paid by such persons on owner-occupied residential property, but such reimbursement shall not be an obligation imposed, directly or indirectly, upon Counties, Cities or Towns; provided, that such tax relief for the years 1973 through 1977 shall be not less than an amount equal to the State, County, and Municipal Taxes on Five Thousand ($5,000) Dollars worth of the full market value (or One Thousand Two Hundred Fifty ($1,250) Dollars of the assessed value) of property used for a residence by any taxpayer over sixty-five (65) years of age for a period of one (1) year prior to the date of assessment, provided further, that such relief shall not extend to persons having a total annual income from all sources in excess of Four Thousand Eight Hundred ($4,800) Dollars.

The Legislature may provide tax relief to home owners totally and permanently disabled, irrespective of age, as provided herein for the elderly.

Tangible Personal Property shall be classified into three (3) subclassifications and assessed as follows:

(a) Public Utility Property, to be assessed at fifty-five (55%) per cent of its value;

(b) Industrial and Commercial Property, to be assessed at thirty (30%) per cent of its value; and

(c) All other Tangible Personal Property, to be assessed at five (5%) per cent of its value; provided, however, that the Legislature shall exempt Seven Thousand Five Hundred ($7,500) Dollars worth of such Tangible Personal Property which shall cover personal household goods and furnishings, wearing apparel and other such tangible property in the hands of a taxpayer.

The Legislature shall have power to classify Intangible Personal Property into subclassifications and to establish a ratio of assessment to value in each class or subclass, and shall provide fair and equitable methods of apportionment of the value of same to this State for purposes of taxation. Banks, Insurance Companies, Loan and Investment Companies, Savings and Loan Associations, and all similar financial institutions shall be assessed and taxed in such manner as the Legislature shall direct; provided that for the year 1973, or until such time as the Legislature may provide otherwise, the ratio of assessment to value of property presently taxed shall remain the same as provided by law for the year 1972; provided further that the taxes imposed upon such financial institutions, and paid by

them, shall be in lieu of all taxes on the redeemable or cash value of all of their outstanding shares of capital stock, policies of insurance, customer savings and checking accounts, certificates of deposit, and certificates of investment, by whatever name called, including other intangible corporate property of such financial institutions.

The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, the value and definition of property in each class or subclass to be ascertained in such manner as the Legislature shall direct. Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.

The Legislature shall have power to tax merchants, peddlers, and privileges, in such manner as they may from time to time direct, and the Legislature may levy a gross receipts tax on merchants and businesses in lieu of ad valorem taxes on the inventories of merchandise held by such merchants and businesses for sale or exchange. The portion of a Merchant's Capital used in the purchase of merchandise sold by him to non-residents and sent beyond the State, shall not be taxed at a rate higher than the ad valorem tax on property. The Legislature shall have power to levy a tax upon incomes derived from stocks and bonds that are not taxed ad valorem.

This amendment shall take effect on the first day of January, 1973."

---

### APPENDIX C

(The call to be printed in full on each ballot or voting machine, as provided in Chapter 49, Public Acts, 1949)

"Shall a Convention be held to alter, reform or abolish the following provisions and subject matter of the Constitution of Tennessee, to-wit: Article II, Sections 4, 5 and 6 (relating to the apportionment of representatives and senators); Article II, Section 11 (relating to the legislative quorum); Article II, Section 23 (relating to the compensation and expenses of members of the Legislature); Article II, Sections 28 and 29 (relating to taxation, so as to empower the Legislature to classify property for taxation and to fix a different rate value, or method of taxation for different classes of property); Article III, Section 4 (relating to the Governor's term of office); Article III, Section 18 (relating to the Governor's veto power); Article IV, Section 1 (relating to the right of suffrage); Article XI, Section 3 (relating to amendments and conventions); Article XI, Section 9, amend this Section either altering, reforming or abolishing it, so as to provide (a) for home rule for municipalities and counties, (b) for uniform systems of city charters to be prescribed by the General Assembly, (c) for the consolidation in whole or in part of governmental and corporate functions of municipalities and counties insofar as may be authorized by the General Assembly; which Convention shall be limited to consideration of and action upon those Sections and the subject matter hereinabove set forth, the action of such Convention to become effective as to each amendment adopted by the Convention only after being separately submitted to and ratified by the voters of the State?

FOR THE CONVENTION

AGAINST THE CONVENTION"

### APPENDIX D

(The call to be printed in full on each ballot or voting machine as provided in Chapter 130, Public Acts, 1951)

"CONSTITUTIONAL REFERENDUM

Shall a convention be held to alter, reform or abolish the following provisions and subject matter of the Constitution of Tennessee, to-wit: Article XI, Section 3 (relating to amendments and conventions); Article II, Section 23 (relating to the compensation and expenses of members of the Legislature); Article III, Section 4 (relating to

the Governor's term of office); Article III, Section 18 (relating to the Governor's veto power); Article IV, Section 1 (relating to the right of suffrage); Article XI, Section 9 (relating to private and local affairs), by altering, reforming or abolishing said section or by adding a new section to said Article XI so as to provide (a) for home rule for municipalities and counties, (b) for uniform systems of city charters to be prescribed by the General Assembly, (c) for the consolidation in whole or in part of governmental and corporate functions of municipalities and counties as prescribed and authorized by the General Assembly; which convention shall be limited to consideration of and action upon those sections and the subject matter hereinabove set forth, the action of such convention to become effective as to each amendment adopted by the convention only after being separately submitted to and ratified and approved by the voters of the State?

FOR THE CONVENTION

AGAINST THE CONVENTION"

———

APPENDIX E

(The call to be printed in full on each ballot or voting machine as provided in Chapter 2, Public Acts, 1962, Extraordinary Session)

"CONSTITUTIONAL REFERENDUM

Shall a convention be held to alter, reform or abolish the following provisions and subject matter of the Constitution of Tennessee, to wit: Article II, Sections 3, 4, 5, 6, 7, 8, 11, 15, 16 and 23 relative to the Legislative Department of State government, its authority and terms of office; the methods and means of apportioning the Representatives and Senators of such department; the time of holding elections for such offices; the time for Legislative meetings and the inauguration of the Governor; policies, quorum, and adjournments of each such House; filling of vacancies for such offices; limitations upon power of adjournment of such

Houses; and the compensation of members of such department; which convention shall be limited to consideration of and action upon these sections and the subject matter herein above set forth, the action of such convention to become effective as to each amendment adopted by the convention only after being separately submitted to and ratified and approved by the voters of the State.

FOR THE CONVENTION

AGAINST THE CONVENTION"

OPINION ON PETITION TO REHEAR

FONES, Chief Justice.

The petition to rehear asserts that we have usurped the power of the people to control a constitutional convention and have misread and overruled *Illustration Design Group, Inc. v. McCanless, supra.*

 We fully recognize that it is the people and not the legislature who approve or reject the submission of constitutional subjects to the consideration of a limited constitutional convention. The legislature in proposing a convention, and in proposing the subjects for its consideration, is not exercising its legislative power to enact statutory law. It is acting as an agency of the people, performing the first step in the amending process by the convention method.

It should be remembered that there are two (2) methods by which our Constitution may be amended: the legislative method and the convention method. Article Eleven, Section Three, Constitution of Tennessee. When the legislative method is used, the proposed amendment is drafted in toto, by the legislature and after the legislative approval prescribed in paragraph one of Article Eleven, Section Three, the amendment is submitted to the people for approval or rejection. When the conviction method is used, historically, the convention has drafted and proposed amendments, upon

those *subjects* included in the call. Paragraph two of Article Eleven, Section Three says that the delegates to such convention shall assemble for the consideration of such proposals as shall have received a favorable vote in the "call" election.

The convention method involves a vote of the people at three (3) separate elections covering a period of years and the expense of convening and maintaining delegates to a convention. It is sheer folly to pursue the convention method unless the purpose is to have the convention draft amendments, that a busy legislature does not have the time to consider. If the legislature has the time to draft constitutional amendments then it should use the legislative method provided in paragraph one, Article Eleven, Section Three. The only legitimate purpose in calling a constitutional convention is to obtain its work product, to wit, a thoroughly debated, maturely deliberated, proposed constitutional amendment to recommend to the people. The people then make the final judgment upon its merit.

In drafting the Question Three call, the legislature deviated from the consistent prior procedure of merely designating specific subjects to be considered by a convention. This has created a serious problem. This is the fourth lawsuit attacking the constitutionality of the Question Three amendment. The basic contention in each case has as its substance, the extensive draft by the legislature of the subject matter of the amendment. The constitutional amending process by the convention method is threatened with instability, and at the center of the storm is the single issue of how far the legislature may go, as an agency of the people, in drafting a subject or a proposal for consideration by a limited constitutional convention.

No one could successfully contend that in calling an unlimited constitutional convention the legislature could draft the whole or any part of a proposed constitution. There is no authority anywhere for such a contention. The only distinction between an unlimited constitutional convention and a limited constitutional convention is that a limited constitutional convention can only consider a *specified part* or *parts* of the Constitution while an unlimited constitutional convention may consider the *whole* of the Constitution, and alter, reform or abolish any part, or all of it. The first three and one half lines of paragraph two Article Eleven, Section Three so provide. *Cummings v. Beeler, supra*, in establishing the validity of the limited constitutional convention so held.

We have held in this case that the legislative function, in acting as the agency of the people, to draft a call of a limited constitutional convention, is to specify the part or parts of the Constitution that the people may want a convention to consider. The call of a limited constitutional convention is not a *law* in the usual sense, and is not enacted by the legislature in the exercise of its fundamental authority to enact statutory law. It does not take effect when enacted by the legislature and has no efficacy until approved by the people. *West v. Carr*, 212 Tenn. 367, 370 S.W.2d 469 (1963). When approved by the people its only vitality is that it prescribes the subjects, or the *parts* of the Constitution that the convention may consider, and has the effect of proscribing that the convention cannot consider subjects or parts of the Constitution that are not included in the call, as approved.

The assertions in the petition to rehear with respect to *Illustration Design Group, Inc. v. McCanless, supra*, reflect a misunderstanding of our opinion in the instant case.

In referring to the legislative function of proposing the subjects the people may want a limited constitutional convention to consider, that case uses phrases which do not appear in any of the authorities cited therein and have caused confusion to the bench and bar of this State. Instead of what we consider the appropriate language derived from *Cummings v. Beeler, supra*, to wit,

that the proposed call should specify the part or parts of the Constitution or the subject, the case under discussion used the following phrases:

"delineating the scope and power of such convention"

"defining its scope and powers" (454 S.W.2d at 119)

"define the scope and action of such convention"

"but they have expressly limited the consideration and action of the convention to the proposals already approved by a vote of the people" (454 S.W.2d at 120)

We agree with the result reached in *Illustration Design Group, Inc., supra.* We disagree with the use of the foregoing phrases, but only insofar as said phrases are interpreted to mean that the legislature may go further than the specification of parts of the Constitution or subjects, to be considered by a limited constitutional convention, and undertake to draft a substantial portion of the amendment itself.

The petition to rehear is denied.

COOPER, HENRY and BROCK, JJ., concur.

HARBISON, J., not participating.