**LOUISVILLE AND NASHVILLE RAILROAD COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

**SOUTHERN RAILWAY COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

**CINCINNATI, NEW ORLEANS AND TEXAS PACIFIC RAILWAY COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

**ALABAMA GREAT SOUTHERN RAILROAD COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

**CLINCHFIELD RAILROAD COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

**ILLINOIS CENTRAL GULF RAILROAD COMPANY**

v.

**PUBLIC SERVICE COMMISSION OF TENNESSEE et al.**

Nos. 78–3142 to 78–3147.

United States District Court, M. D. Tennessee, Nashville Division.

May 4, 1978.

163

Robert C. Moore, Atty. Gen., Louisville, Ky., Tyree B. Harris, Nashville, Tenn., Everett Gibson, Gregory G. Fletcher, Memphis, Tenn., William C. Antoine and James W. McBride, Southern Railroad System, Washington, D.C., Dan E. McGugin, Jr., Nashville, Tenn., for plaintiffs.

Eugene Ward, Public Service Commission, Everett Falk, Deputy Atty. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM

*MORTON, Chief Judge.*

The six plaintiff railroad companies each filed separate suits in this court against the Public Service Commission of Tennessee ("Commission") and the individual members thereof and against the State Board of Equalization of Tennessee ("State Board") and its individual members, seeking to enjoin the State Board from certifying to the Commission the valuation fixed by it upon the plaintiff's property for the year 1977, and seeking to restrain and enjoin the Commission from certifying to the counties and municipalities in Tennessee the amount of the 1977 assessment of the plaintiff's prop-

erty to be taxed in such counties and municipalities or from taking any other action to enforce the taxes imposed under the laws of the State of Tennessee based on the order of the State Board.

The complaint filed by each plaintiff further sought an order declaring such assessments to be illegal, null and void, and to have the court either fix the amount of the assessed value of the plaintiff's property or to remand the cause to the State Board with instructions to equalize the appraisal of each plaintiff's property to the statewide average of appraised value of locally assessed property. The complaints filed by plaintiffs are identical except for the name of plaintiff and the amount of the valuation found as to each. The answers of the defendants are likewise identical. Upon application of plaintiffs, the court issued a temporary restraining order in each of the cases on April 13, 1978, enjoining and restraining both defendants from certifying the value fixed by the State Board upon the plaintiffs' properties for the year 1977, and set the cause for hearing on application for a permanent injunction, as well as for final determination, on April 21, 1978, later changed by the court to April 22, 1978. All the cases were consolidated for trial.

No oral testimony was introduced at the trial; instead, the parties by stipulation introduced a substantial portion of the transcript of the proceedings before the State Board. It appears from the record thus introduced that only one consolidated hearing was held before the State Board.

■ From the record in these consolidated cases the court finds that each of the plaintiffs has been assessed on both its operating and nonoperating properties based upon a valuation of 100% of market value. This finding of fact was agreed to at the bar of this court by counsel representing the defendant State Board in this cause.

It further appears to the court through the Real Estate Appraisal Sales Ratio Report ("Sales Ratio Report") prepared and published by the Division of Property Assessments, an agency of the State of Tennessee, and the underlying data, that the state-wide median of appraisal of locally assessed properties [1] is 62.9% of value. It further appears from the evidence introduced in the record by expert testimony that there was only a five percent chance that the median level of appraisal of locally assessed property in Tennessee would vary more than 3/10 of 1% from the 62.9% median as found from the Sales Ratio Report. In other words, the chances were 95 out of 100 that the median level of appraisal of residential, farm, commercial, and industrial properties would not be less than 62.6% nor more than 63.2%. It further appeared that there was only one chance out of a million that such median would be higher than 65.7%.[2] In its order, which these ac-

1. All taxable property in the State of Tennessee is assessed for tax purposes at the local level except for public utility properties which are assessed centrally by the Commission.

2. The Sales Ratio Report is a form of technical study sometimes referred to in the property tax administration field as an "assessment to sales ratio study." Assessment to sales ratio studies are generally and widely used for the purpose of testing the level of assessment or appraisal for assessment purposes of locally assessed property. The ratio of market value to assessed or appraised value of property is determined by examining the affidavit of value or deed stamps on a recorded deed and comparing that value to the tax assessor's appraised value for ad valorem tax purposes. Individual transactions are then edited to exclude transfers which do not appear to be at arm's length, such as transfers between family members, related

corporations, and the like. Those ratios surviving the editing or verification process are then used to calculate average levels of assessment or levels of appraisal for assessment purposes.

Plaintiffs offered evidence before the State Board to corroborate the validity of the Tennessee sales ratio study. James Gordon Primm, Supervisor of Field Assessments, described procedures followed in compiling the Sales Ratio Report. Mr. Primm's testimony was followed by a review and analysis of the Sales Ratio Report and underlying data by witnesses who qualified as experts in the field of preparing and evaluating assessment to sales ratio studies. One of the two expert witnesses testifying for the plaintiffs was Rolf A. Weil, Ph.D., President of Roosevelt University in Chicago, Illinois, an economist whose academic specialty is state and local finance. He has had extensive experience in conducting assessment to sales ratio studies, both as Director of the

tions seek to review, the State Board discussed the validity of sales ratio studies generally, and this Sales Ratio Report in particular, in the following language:

Sales ratio studies are recognized as a method to obtain evidence of levels of values. If properly conducted, the sales ratio method has objectivity, efficiency and standardization. Data in such studies are matters of public record and can be checked and inspected. Tax administrators, courts, commissions and academicians have generally accepted the use of such studies for equalization purposes.

. . .

Witnesses who reviewed the procedures and instructions given to the employees who collected the data indicated that they were proper and acceptable. It appears that adequate steps were taken to obtain sales and compute the ratios by objective means and in a random manner.

Property Tax Division, Illinois Department of Revenue, and as a private consultant. Dr. Weil reviewed the procedures followed by Mr. Primm and his staff in compiling the Sales Ratio Report and reviewed the report itself. He testified that in his opinion, the Sales Ratio Report was prepared in accordance with generally accepted practices; and that in his opinion the result of the Sales Ratio Report is adequate for property tax equalization purposes.

The other expert witness testifying for the plaintiffs was Frederick A. Ekeblad, who also holds a Ph.D. in economics. Dr. Ekeblad's specialty is statistics. He served for a number of years as Chairman of the General Economics Department, School of Business Administration, Northwestern University, and was later Dean of the College of Business Administration at the University of Bridgeport. He has had extensive experience in preparing statistical summaries and confidence limit calculations from data collected for assessment to sales ratio studies. Dr. Ekeblad took all of the underlying data used in preparing the Sales Ratio Report which had been compiled on a county by county basis and arrayed the data on a statewide basis to calculate the statewide median level of appraisal of locally assessed property weighted by class of property and parcel count. He found the median level of appraisal of locally assessed property to be 62.9%. By application of standard statistical procedures to the result, he determined the 95% confidence limits to be 62.6% on the low side and 63.2% on the high side. He further determined that there was only one chance out of a million that

Having thus commented upon the validity of the Sales Ratio Report in question, the State Board concluded that while the report could not be considered conclusive as to the degree of the disparity that existed in the respective counties between the appraisal of public utility property and the appraisal of locally assessed property, it was the "best information available" to the State Board. The Board further noted that:

No doubt the median is the appropriate measure of central tendency to be used in comparing valuations and assessments of property. This measurement is not distorted by extremely high or low valuations and seems to be widely recognized as the appropriate measure to determine "average" valuations and assessments for ad valorem tax purposes.

The State Board, therefore, found the average level of appraisal of locally assessed property for tax purposes to be 63%.[3]

the statewide median would be higher than 65.7%.

3. The action taken by the State Board as a result of this conclusion, while ostensibly "relief" for plaintiffs, is in fact mere tokenism designed to forestall meaningful relief and thus to perpetuate rather than remedy plaintiffs' unequal burden of taxation. After stating that the sales ratio study "is the best information available to the Board at this time upon which to take appropriate action," the Board concluded that:

Therefore, . . . for 1977 the final valuations of railroads subject to these appeals shall be reduced in counties where the median ratios are below 63.

It should be observed that after the sales ratio study was conducted, reappraisal programs were completed in the counties of Hawkins, Sevier and Williamson. The revised values for locally assessed properties resulting from the reappraisal programs in these counties were used as the basis for assessments for 1977; therefore, the ratios shown in the sales ratio study are invalid for these counties, and no adjustment is required for these counties.

The Board recognizes that reappraisal programs are being completed in about ten counties for 1978, and that approximately twenty additional counties have entered into contracts with the Division of Property Assessments to carry out and update reappraisal programs in the immediate future. The Board compliments the efforts which have been initiated by local officials of these counties and encourages similar steps to be taken

Based upon all the foregoing, the court accepts this finding and makes its own finding that all property in the State of Tennessee, other than public utility property which is centrally assessed, is appraised for tax purposes at a median or "average" of 63% of value.

Plaintiffs next insist that the appraisal of their properties at 100% of value and the appraisal of all other properties at substantially less than 100% has existed over a period of many years and is systematic and intentional. The court finds that this insistence is sustained by the evidence. Such allegations have been sustained by the courts over a period of years. Judge William E. Miller, in the case of *Louisville & Nashville Railroad v. Public Service Commission*, 249 F.Supp. 894 (M.D. Tenn. 1966), aff'd 389 F.2d 247 (6th Cir. 1968), found that at that time railroad property was being assessed at not less than 55% to 65% of actual value, whereas the state-wide average of locally assessed property was not more than 30% of its cash value. Again, in the year 1966, the Court of Appeals for the State of Tennessee found in the case of *Southern Railway v. Clement*, 57 Tenn.App. 54, 415 S.W.2d 146 (1966), *cert. denied* (1967), that the railroad there involved was assessed at at least 60% of its actual value and probably at 100% of value, but that the locally assessed property in at least two counties, Hawkins and Loudon, were assessed at only 9% to 11% of value. (It is interesting to note that while the State Court of Appeals in *Southern Railway* directed all future assessments in Loudon and Hawkins Counties to be based upon 100% of value, the recent Sales Ratio Report shows a median level of appraisal for Loudon County of only 45% of value and for Hawkins County of only 34%.)

Further, the record before the State Board reflects that the differential in the valuation of locally assessed properties and the valuation of railroad properties remains systematic and intentional despite what

in other counties. The State Division of Property Assessments will assist any county in carrying out such steps as may be required.

would appear to be a major development in State law.

Largely as a result of the decisions in *Louisville & Nashville Railroad v. Public Service Commission, supra,* and *Southern Railway v. Clement, supra,* article II, section 28 of the Tennessee Constitution was amended in 1973. This amendment, commonly known as the Question 3 amendment, was discussed by the Tennessee Supreme Court in *Snow v. City of Memphis,* 527 S.W.2d 55 (1975). The court noted that "in its pre-amendment status Article II, Section 28 provided no basis for the assessment of any species of property at less than its actual cash value," and that the "purpose and objective of the Question 3 amendment, is to tax income-producing property at a higher rate than owner-occupied residences and farms." *Id.* at 66. Article II, section 28 as amended provides:

Real property shall be classified into four (4) subclassifications and assessed as follows:

(a) Public Utility Property, to be assessed at fifty-five (55) percent of its value;

(b) Industrial and Commercial Property, to be assessed at forty (40) percent of its value;

(c) Residential Property, to be assessed at twenty-five (25%) percent of its value, provided that residential property containing two (2) or more rental units is hereby defined as industrial and commercial property; and

(d) Farm Property, to be assessed at twenty-five (25%) percent of its value.

In holding the classification scheme of this provision to be "constitutionally permissible . . . beyond question" the *Snow* court stated with what this court regards as undue optimism, that:

The constitutional and statutory scheme that has resulted from the Question 3 amendment has brought about a

(Emphasis added.) The order of the State Board is set out in Appendix A to this opinion.

state of uniformity and equality of assessment of real property in Tennessee that while not perfect can conservatively be described as vastly superior to its predecessor system in approaching *the objective of equality and uniformity throughout the state within the classifications provided.* Perfection in the taxation of real property is neither required nor attainable.

527 S.W.2d at 66 (emphasis added). While the goal of equality within the four classifications is a laudable one, it does not fully serve the equal protection clause of the fourteenth amendment to the Constitution of the United States, which requires that the unequal treatment of the four classifications be limited to the application of the unequal percentages provided in the amendment. The *value* to which these percentages are to be applied may not also be unevenly determined from one classification to another. The court agrees with plaintiffs that:

The effect of the order of the Board of Equalization is to amend the Constitution of the State of Tennessee to require that public utility property be assessed at 55% [of 100%] of its value, industrial and commercial property to be assessed at 40% *of 63%* of its value, residential property to be assessed at 25% *of 63%* of its value and farm property assessed at 25% *of 63%* of its value.

Plaintiff Louisville & Nashville Railroad's *Memorandum Brief,* filed April 12, 1978, at 2 (emphasis added).

Thus it appears that the Question 3 amendment of article II, section 28, has done little to alter the pattern of differential treatment of which plaintiffs complain. Indeed, the new scheme may have hampered rather than facilitated true reform. At least two representatives of the taxing authorities in the various counties testified that they were not attempting to appraise properties assessed by them at 100% of value. In addition, the record reflects that the State Board, during the hearing to determine railroad valuation for the year 1976, concluded that the counties were not ap-

praising locally assessed properties at 100% of value and called upon the counties to correct this inequality. William R. Snodgrass, State Comptroller of the Treasury and a member of the State Board, stated at the hearing on April 11, 1978, that something has to be done to induce the counties to do what the law requires of them and noted that counties which do not attempt to comply with the law benefit because the low level of appraisal requires higher tax rates applicable to utility values:

Somehow we've got to do something that makes it desirable for counties to do what the law requires of them to do. . . .

In the past those who don't make the effort gain. Those who do make the effort are penalized, because what they do by having a low level of assessment, they have a high tax rate, and that applies to utility values. Those that make the change and try to update voluntarily automatically lose in the situation as it relates to the local taxpayers as it relates to the utilities.

That being the case, we have been continuing a situation that makes it politically difficult for the local officials and in fact it makes it evidently almost impossible.

In an effort to cause appraisals to be increased, the State Board ordered a reduction in the assessment of railroad properties, but only in those counties that were appraising locally assessed properties below the 63% state-wide median, and then, only to the extent that the appraisal of locally assessed properties fell below the state-wide median. (See footnote 3, *supra,* and Appendix A, *infra.*) The State Board apparently concluded that such inequalities would continue into the future since it indicated that for the year 1978 it would require counties to bring local appraisals up to 70% of value. The court, therefore, reaches the inescapable conclusion that the action of the various counties in appraising locally assessed properties at a substantially lesser percentage of value than the value placed upon railroad property is both systematic and intentional.

Based upon the allegations of their respective complaints, to the extent that they are sustained by the foregoing findings of fact, plaintiffs insist that they are entitled to have the appraisal of their properties equalized with the appraisal of all other properties in Tennessee. To the merits of the case, counsel for the State Board raises essentially three defenses. First, while he admits that locally assessed nonutility property is not generally appraised at market value, he denies that this is the result of a systematic and intentional practice. This has hereinabove been determined adversely to counsel's position. Second, it is urged that while the Sales Ratio Report and the expert testimony show that locally assessed property is appraised at only 63% of value, the Report is not conclusive evidence of such fact. While perhaps not conclusive, it is strong and convincing evidence of that fact, and there being no substantial evidence to the contrary, it must be and is accepted by the court just as it was accepted by the State Board.

■ Finally, counsel for the State Board argues that since under article II, section 28 of the Constitution of Tennessee, as amended in 1972, all property is now classified into four (4) subclassifications, the only equalization to which a taxpayer is entitled is to be equalized with other property falling into the same subclassification. As indicated earlier in this opinion, the court finds no merit in this contention. It is clear that the amendment to article II, section 28 was not intended to change the single standard of value for all property. The court cannot seriously entertain the thought that the people of Tennessee, through the constitution, could have intended the inequitable and discriminatory result which the State urges. The court, therefore, finds that all property must be valued under the Constitution of the State of Tennessee at 100% of market value, and the failure of the taxing authorities to so value one or more subclasses permits those subclasses whose property is appraised at market value to seek and obtain equalization.

While courts are not bound by the interpretation placed upon constitutional provisions by legislatures or boards and commissions, the court does note that its construction of article II, section 28 of the Constitution of Tennessee, is consistent with the construction placed thereon by the Legislature of the State. For example, T.C.A. § 67–606 provides that

The value of *all* property shall be ascertained from the evidence of its sound, intrinsic and immediate value . . . .

It is the legislative intent hereby declared that . . . all property of every kind shall be appraised according to its sound, intrinsic and immediate economic value

. . . .

(Emphasis added.)

T.C.A. § 67–806 provides:

*Any* owner of property liable for taxation in the state shall have the right . . . to make complaint before the county board of equalization on one or more of the following grounds; . . . (3) *Property other than property owned by the taxpayer* has been assessed on the basis of appraised values which are less than the basis of value provided for in Section 67–606.

(Emphasis added.)

The quoted language is wholly inconsistent with the notion that equalization is permitted only within a particular subclass. Further, the State Board in the very order the court is called upon to review in these cases, stated: "On the other hand, the Board cannot allow the valuations of locally assessed property to continue to deteriorate from current values without any steps being taken to improve this situation. *A reasonable effort must be made to maintain fair valuations for the assessments of all property.*" (Emphasis added.) Thus, both the Tennessee State Legislature and the State Board have in effect found that equalization is required among all classifications of property.

■ In view of the foregoing findings, it becomes obvious that plaintiffs are entitled

to equalization relief. The question next presented is whether or not this court has jurisdiction to grant the relief prayed. Plaintiffs invoke the jurisdiction of this court upon diversity of citizenship, the commerce clause of the Constitution of the United States and the equal protection clause of the fourteenth amendment. For the reasons set forth hereinafter, jurisdiction based upon a federal question is proper, and plaintiffs are entitled to prevail on their claims for equal protection of the laws. It is not necessary, therefore, to address the commerce clause question raised by plaintiffs nor to decide whether jurisdiction based upon diversity of citizenship would be proper.

Since plaintiffs have been denied effective equalization, they are entitled to invoke federal jurisdiction under the equal protection clause of the fourteenth amendment, as held by Judge Miller in *Louisville & Nashville, supra,* and as further held by the Supreme Court of the United States in a number of cases including *Hillsborough Township v. Cromwell,* 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918).

It therefore appears that this court has jurisdiction to grant the relief prayed unless it is restrained from doing so by 28 U.S.C. § 1341, which provides that "The district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law where a plain, speedy and efficient remedy may be had in the courts of such state." Thus the question presented to the court is whether or not under the laws of the State of Tennessee a plain, speedy and efficient remedy is available to plaintiffs in these consolidated cases. Judicial interpretations of 28 U.S.C. § 1341 are summarized in *Garrett v. Bamford,* 538 F.2d 63 (3rd Cir. 1976):

> Supreme Court decisions construing this statutory language offer two essential points of guidance. First, although it can

be argued that Congress meant to establish a more stringent standard for federal intervention, the decisions indicate that "plain, speedy and efficient" means no more than the prior equity standard of "adequacy." Second, it is sufficient for a finding of inadequacy that the availability of the state remedy be merely uncertain. *Hart and Wechsler, supra* note 5, at 979, *Spector Motor Service, Inc. v. O'Connor,* 340 U.S. [602], 605, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Township of Hillsborough v. Cromwell,* 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

*Id.* at 67.

In 1901 the Supreme Court of Tennessee had before it the case of *Carroll v. Alsup,* 107 Tenn. 257, 64 S.W. 193, in which case the plaintiff insisted that his property was worth $12,000.00, that he had been assessed on a value of $10,500.00, and that this represented a considerably higher percentage of value than the assessed value of other property owners. He insisted that under equalization he was entitled to have his assessment reduced to $7,200.00, in order to put his property on an "equal and uniform basis and parity with other property in Shelby County." In rejecting Mr. Carroll's contention, the Supreme Court stated that:

> It is the evident policy and object of the law, in cases of unequal assessments, not to reduce the assessments upon the property unless it has been assessed beyond its actual value, but, instead, to raise up to that valuation all property that has been inadequately assessed, and thus to equalize taxation on all property. The recourse offered to the taxpayer is not to reduce his own assessment unless it is beyond its cash actual value, but to have that of his neighbor increased until both reach the point of actual cash value, and thus become equal and uniform, as the law provides and the Constitution contemplates.

*Id.* at 284, 64 S.W. at 200. The court further held that:

It is no ground for relief to him, nor can any taxpayer be heard to complain of his assessments when it is below the actual cash value of the property, on the grounds that his neighbor's property is assessed at a less percentage of its true or actual value than his own. When he comes into court asking relief of his own assessment, he must be able to allege and show that his property is assessed at more than its actual cash value.

*Id.* at 292, 64 S.W. at 202.

In 1964 the Supreme Court of the United States had before it for consideration the case of *Hillsborough Township v. Cromwell, supra.* There, plaintiff insisted that other properties were assessed at a smaller percentage of value than his, and that therefore he was entitled to relief under the equal protection clause of the Constitution of the United States. The courts of New Jersey at that time followed a rule similar to *Carroll v. Alsup.* The United States Supreme Court, in granting the relief prayed and in finding that the taxpayer had no plain, speedy and efficient remedy at state law, declared that, "The constitutional requirement [Equal Protection], however, is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class." 326 U.S. at 623, 66 S.Ct. at 448.

Despite the opinion of the Supreme Court in *Hillsborough*, decided in 1946, the Supreme Court of Tennessee subsequently reaffirmed the rule set out in *Carroll v. Alsup* in the case of *McCord v. Nashville, Chattanooga & St. Louis Railway*, 187 Tenn. 277, 213 S.W.2d 196 (1948), again holding that a taxpayer could not through equalization ask to have his assessment reduced. His only remedy was to "come before an equalization board, or perhaps before the courts, and show that his neighbors' property is assessed at less than its actual value, and ask to have it raised to his own, if his is at the cash value . . . ." *Id.* at 292, 213 S.W.2d at 203. Thereafter, the Supreme

Court of Tennessee continued to reaffirm *Carroll v. Alsup* on each occasion that the issue was presented. *Mayor of Morristown v. Burke*, 207 Tenn. 180, 338 S.W.2d 593 (1953); *Biltmore Hotel Court v. City of Berry Hill*, 216 Tenn. 62, 390 S.W.2d 223 (1964). This being the status of the law in Tennessee at the time the case of *Louisville & Nashville, supra,* was presented to Judge Miller, he found that the railroad had no plain, speedy and efficient remedy under the state law and that, therefore, he was required to enjoin the assessment of the railroad's property by the State Board, stating that:

As we have seen, that is still the law in Tennessee, and since there is no plain, speedy, and efficient remedy in Tennessee to correct the intentional and systematic violations of either its own law or of the Fourteenth Amendment, federal declaratory and injunctive relief is not only proper but necessary for the protection of plaintiff's constitutional rights. The defendants' abstention argument has been considered by the Court. But in view of the settled state rule, the Court is persuaded that any appeal to the state courts would be in vain.

249 F.Supp. at 904. Judge Miller's action in granting the relief prayed for was affirmed by the Sixth Circuit at 389 F.2d 247.

Therefore, unless there has been some change in the law of the State of Tennessee since the opinion of Judge Miller rendered in 1966, the plaintiffs are entitled to the relief that they seek herein. The Tennessee Supreme Court has apparently not been called upon to review its holding in *Carroll v. Alsup* since Judge Miller's opinion. The Tennessee Court of Appeals discussed *Carroll v. Alsup* in *Southern Railway v. Clement*, 57 Tenn.App. 54, 415 S.W.2d 146 (1966), *cert. denied* (1967). There, Southern Railway Company sought to apply the *Carroll v. Alsup* rule so as to require the local assessments in Hawkins and Loudon counties to be increased to actual cash value. While the plaintiff in *Southern Railway* made no effort to overturn the rule in *Carroll v. Alsup*, the Court reaffirmed and followed that rule in ordering that assessments of undervalued property be increased.

The United States District Court for the Western District of Tennessee considered the present status of the law of Tennessee in the case of *Southland Mall, Inc. v. Garner*, 293 F.Supp. 1370 (1968), and concluded that *Carroll v. Alsup* was still the law in Tennessee. The Court stated at page 1374:

At the outset, it should be pointed out that a Tennessee taxpayer can, through the procedure above summarized, seek to have his county assessment reduced to actual value; but to the extent that his complaint is that his property is assessed at a greater percentage of actual value than is other property of the same class, his only remedy is to seek to have the assessment of the other property increased.

While this opinion involved an interlocutory order and was not appealed, the final decision in *Southland Mall, Inc.* was appealed to the Sixth Circuit. In affirming the action taken by Judge Brown, Judge Celebreeze stated:

In light of the pending state action we have considered the propriety of federal abstention in this present matter. A review of the questions presented in each action and of the remedies available to Appellant in this type of state proceeding convinces us that there is no possibility that any decision in the state court could eliminate the need for facing the constitutional question presented here. See *Hillsborough v. Cromwell*, 326 U.S. 620, 623, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Louisville & Nashville Railroad Co. v. Public Service Comm. of Tennessee*, 249 F.Supp. 894, 903–904 (M.D.Tenn.1966) aff'd 389 F.2d 247 (6th Cir. 1968). Accordingly, we believe abstention would be inappropriate in this case.

*Southland Mall, Inc. v. Garner*, 455 F.2d 887, 888 n. 1 (6th Cir. 1972). It appears, therefore, that there has been no change in decisional law of Tennessee since Judge Miller's opinion in 1966.

Counsel for the State Board has argued that statutory provisions governing the administrative review of property tax assessments in Tennessee have changed since the time of the decision in the *Louisville & Nashville* case and have greatly expanded the power of the State Board to equalize assessments. Counsel would have this court conclude that these statutory changes have in some manner altered and overruled the holding of the Tennessee Supreme Court in *Carroll v. Alsup*. However, a thorough comparison of the statutory provisions governing the powers and duties of the State Board as they existed at the time of *Louisville & Nashville* with the statutory provisions governing the powers and duties of the State Board today reveals no substantive change in the law.

The Tennessee Code as it existed at the time of *Louisville & Nashville* (the applicable portions of which statutes are set out in Appendix B to this opinion) granted the State Board jurisdiction over the assessment of all properties in the state and imposed upon the State Board the duty to equalize assessments. T.C.A. § 67–823. State Board members were required by T.C.A. § 67–207 to "equalize, fix, and compute the values of properties within their jurisdiction, so that the value thereof [will] conform to the standard of the actual cash value of the same." Any taxpayer, or "owner of property liable for taxation in the state," was authorized by T.C.A. § 67–804 to "make complaint before the county board of equalization that other property or properties in the county [were] assessed at less than the actual cash value thereof or at a less percentage of value than complainant's own property." An aggrieved taxpayer was further entitled by T.C.A. § 67–821 to a hearing and determination by the State Board "of any complaint he may make on the ground that other property than his own [was] assessed at less than the actual cash value thereof, or at a less percentage of value than his own property or other property or that his own property [was] assessed at more than its actual cash value . . . ." The State Board was empowered by T.C.A. § 67–822 to equalize assessments of property "by reducing or increasing, the values thereof, by classification of property, or by wards, civil districts or counties or in such manner as will enable

the board to justly and equitably equalize assessments in conformity with [the standard of actual cash value]." With regard to the assessment of utilities and carriers, T.C.A. § 67–928 empowered the State Board "to increase or diminish the valuation placed upon any property valued by [the railroad and public utilities commission]." Under T.C.A. § 67–929, any railroad or public utility that was aggrieved by the certified assessment of the State Board and that successfully challenged the assessment in the state or federal courts would be entitled to a refund or credit after payment of its taxes under protest. The action of the State Board in certifying assessments was considered final action for purposes of judicial review. T.C.A. § 67–823. Judicial review was controlled by T.C.A. § 27–801.

Under present statutes (set out in Appendix C to this opinion), the State Board is empowered to take "whatever steps it deems are necessary to effect the equalization of assessments, in any taxing jurisdiction within the state in accordance with the laws of the state . . . ." T.C.A. § 67–831. Any taxpayer, or "owner of property liable for taxation in the state," is authorized by T.C.A. § 67–806 to make "complaint before the county board of equalization" on the ground that his property has been erroneously classified, or that his property has been assessed on the basis of an appraised value in excess of market value, or that property other than his own has been assessed on the basis of appraised values that are less than market value. An aggrieved taxpayer is further entitled by T.C.A. § 67–810 to a hearing and determination by the State Board "of any complaint he may make on any of the grounds provided for in § 67–806." The State Board is empowered by T.C.A. § 67–838 to effect equalization "by reducing or increasing the appraised values of properties within any taxing jurisdiction, or any part thereof . . . ." The State Board is authorized by T.C.A. § 67–932 "to increase or diminish the valuation placed upon any property valued by (the Commission)." Any railroad or public utility that is aggrieved by the assessment certified by the State Board and that suc-

cessfully challenges the assessment in the state or federal courts is entitled to a refund or a credit after payment under protest under T.C.A. § 67–933. T.C.A. § 67–840 provides that the action of the State Board in certifying assessments is considered final action for purposes of judicial review. Judicial review is now controlled by T.C.A. § 4–523(h).

It is apparent from the foregoing analysis that present statutes governing the powers and duties of the State Board are merely a recodification of the statutes as they existed at the time of the *Louisville & Nashville* decision, and that present statutes have effected no substantive change in the powers and duties of the State Board. This court therefore concludes that contrary to the position of the State Board in this case, the present statutory provisions have not in any manner altered or overruled the holding of the Tennessee Supreme Court in *Carroll v. Alsup.*

Finally, it is argued with great earnestness by counsel for the State Board that with the passage of the Tennessee Uniform Administrative Procedures Act (the UAPA), effective July 1, 1975, the state courts now have a broader scope of review of administrative findings than they had prior to the adoption of that Act. Counsel strongly insists that *Carroll v. Alsup* may no longer be the law in Tennessee in view of T.C.A. § 4–523, which provides in pertinent part as follows:

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) in violation of constitutional or statutory provisions;

The difficulty with the State Board's position with respect to the above quoted provision of the UAPA is that counsel for the State Board conceded and stipulated at the trial of this cause that the courts of the state had the authority prior to the

adoption of the UAPA to reverse or modify the decision of an administrative board whenever it found a decision to be "in violation of constitutional or statutory provisions." Thus, it appears by stipulation that the courts of Tennessee have had the same power both before and after the adoption of the UAPA to review the actions of administrative bodies for violations of constitutional or statutory provisions.

While the status of the law as it existed prior to the passage of the UAPA was stipulated, the court finds that the stipulation is a correct statement of the law. In property tax cases, prior to the enactment of the UAPA, an aggrieved taxpayer could obtain judicial review of his assessment by exhausting the statutory administrative review procedure and appealing from the administrative decision through petition for common law certiorari authorized by T.C.A. § 27–801. That statute specifically provided that certiorari could be granted in any case where the board had acted illegally; power to grant relief by petition for certiorari was clearly available where the constitutional or statutory rights of taxpayers were violated. In *McCord, supra,* the Tennessee Supreme Court specifically held that the violation of a taxpayer's right to equal protection of the law constituted an illegality that was reviewable by the court on petition for writ of certiorari. The court refused, however, to grant relief, basing its decision on the rule of *Carroll v. Alsup.* Judge Miller in *Alterman Transport Lines, Inc. v. Public Service Comm. of Tenneseee,* (M.D.Tenn.1966) 259 F.Supp. 486, 490, characterized the rule of *Carroll v. Alsup* and its progeny as a

> roadblock . . . across all procedural avenues—whether a suit for tax refund after payment under protest, an application to the courts to review by certiorari the findings of the Equalization Board, or a suit inequity to enjoin the challenged assessment as the basis for local taxes— effectively barring access to either of them.

While district courts also have authority under 28 U.S.C. § 1341 to enjoin, suspend or restrain assessments where the court finds "uncertainty surrounding the adequacy of state remedy," *Hillsborough v. Cromwell, supra,* 326 U.S. at 626, 66 S.Ct. at 449, this court finds that the possibility of state relief goes beyond mere uncertainty, and, in fact, under the law of the State of Tennessee as it presently exists, the plaintiffs have no practical remedy at all.

In view of all of the foregoing, the court concludes that it has jurisdiction of the matters before it and that the plaintiffs are entitled to relief.

■ The sole question remaining for the court's determination is the form and extent of the relief to be granted. Plaintiffs contend that the relief to which they are entitled is a reduction of their final assessments to 63% of the assessments which would otherwise have been determined based upon plaintiffs' property values, conceded to be at 100% of actual value, fixed by the State Board, thereby placing the amount of their taxes on a constitutionally proportionate basis with taxes paid on locally assessed property. The court finds such a reduction to be appropriate in this case. Courts in a number of states have determined that the differential in property appraisal levels shown by an assessment to sales ratio study is the proper indicator of relief to be granted in property tax equalization suits. *See, e. g., Southern Bell Telephone and Telegraph Co. v. County of Dade,* 275 So.2d 4 (Fla.1973); *People ex rel. Wenzel v. Chicago & North Western Railway,* 28 Ill.2d 205, 190 N.E.2d 780 (1963); *Grainger Brothers Co. v. County Board of Equalization,* 180 Neb. 571, 144 N.W.2d 161 (1966); *In Re Appeal of Kents 2124 Atlantic Ave., Inc.,* 34 N.J. 21, 166 A.2d 763 (1961); *Baken Park, Inc. v. County of Pennington,* 79 S.D. 156, 109 N.W.2d 898 (1961).

It is the duty of the State Board and/or the Commission, to certify to the counties and to the municipalities the proper amount of assessed values determined in accordance with this opinion upon which the counties and municipalities are entitled to levy a tax. In view of the fact that the appraisal levels vary from county to county, ranging from

an average of 23% of value in Hancock County to an average of 89% of value in Sullivan County, the defendants may find it advisable to certify assessments based upon each county's average level of appraisal, rather than the state-wide median for all counties. This matter is left to the judgment of the appropriate defendants.

Judgment will be entered declaring the rights of the plaintiffs in accordance with this opinion and enjoining defendants from certifying or enforcing the challenged assessment of plaintiffs' properties without prejudice to the right of the State Board to rehear and reconsider the assessments for the sole purpose of a reduction to 63% of the assessments that would otherwise have been determined based upon plaintiffs' property values fixed by the State Board. Pending such redetermination the case will be retained on the active docket with any party having the right to apply to the court at any time for other or additional orders.

## APPENDIX A
### ORDER

For reasons hereinbefore set out, the State Board of Equalization hereby orders and directs that:

1. The 1977 valuations of the operating properties of the Louisville & Nashville Railroad Company and Southern Railway Company shall be set as follows:

Louisville & Nashville Railroad Company $710,000,000
Southern Railway Company $850,000,000

2. The final assessments of the railroads subject to these appeals shall be reduced in counties where the median ratio is below 63. The adjustments shall be based on the percentage the median in such counties bears to 63. The counties and factors to be applied are:

| County | Median | Factor | County | Median | Factor |
|--------|--------|--------|--------|--------|--------|
| Hamblen | 62 | .9841 | Van Buren | 52 | .8254 |
| Rhea | 62 | .9841 | Cocke | 52 | .8254 |
| Crockett | 62 | .9841 | Lauderdale | 51 | .8095 |
| Shelby | 60 | .9524 | Decatur | 51 | .8095 |
| Haywood | 60 | .9524 | White | 51 | .8095 |
| Hickman | 60 | .9524 | Dickson | 51 | .8095 |
| Obion | 59 | .9365 | Warren | 51 | .8095 |
| Maury | 59 | .9365 | Chester | 50 | .7937 |
| Pickett | 59 | .9365 | Perry | 50 | .7937 |
| Scott | 58 | .9206 | DeKalb | 50 | .7937 |
| Fentress | 58 | .9206 | McMinn | 50 | .7937 |
| Claiborne | 58 | .9206 | Clay | 50 | .7937 |
| Lake | 57 | .9048 | Campbell | 49 | .7778 |
| Giles | 56 | .8889 | Wayne | 49 | .7778 |
| Carroll | 56 | .8889 | Jefferson | 48 | .7619 |
| Trousdale | 56 | .8889 | Hardin | 48 | .7619 |
| Sequatchie | 56 | .8889 | Henderson | 48 | .7619 |

| County | Median | Factor | County | Median | Factor |
|--------|--------|--------|--------|--------|--------|
| Morgan | 55 | .8730 | Anderson | 47 | .7460 |
| Smith | 55 | .8730 | Unicoi | 47 | .7460 |
| Marshall | 55 | .8730 | Bledsoe | 46 | .7302 |
| Marion | 55 | .8730 | Tipton | 46 | .7302 |
| Jackson | 54 | .8571 | Lawrence | 46 | .7302 |
| Henry | 54 | .8571 | Loudon | 45 | .7143 |
| Lewis | 54 | .8571 | Robertson | 44 | .6984 |
| Overton | 54 | .8571 | Union | 42 | .6667 |
| Fayette | 53 | .8413 | Benton | 41 | .6508 |
| Cheatham | 53 | .8413 | Monroe | 40 | .6349 |
| Coffee | 53 | .8413 | Grundy | 37 | .5873 |
| Weakley | 53 | .8413 | Cannon | 32 | .5079 |
| Franklin | 52 | .8254 | Hancock | 23 | .3651 |

3. The Board hereby approves the Report and Recommendations of the Hearing Examiner relating to the non-operating properties of Louisville & Nashville Railroad Company subject to the following provisions:

a. For 1978, public utility companies should be given sufficient notice of any change in the valuation or classification of any property to review such changes before they become final.

b. The Board recommends that in the valuation of non-operating property the staff of the Commission consult county assessors of property.

## APPENDIX B

### FORMER TENNESSEE STATUTES

67–207. Oath of board members.—It shall be the duty of the members to discharge the duties of said board without compensation, save such expenses, but before entering upon the discharge of such duties, they shall take and subscribe to an oath that they will fairly and impartially perform the duties imposed upon them by this chapter, and equalize, fix, and compute the values of properties within their jurisdiction, so that the value thereof shall conform to the standard of the actual cash value of the same. Said oath shall be taken before some person authorized by law to administer an oath and be filed in the office of the secretary of state for preservation. [Acts 1907, ch. 602, § 37; Shan., § 807a2; Code 1932, § 1472.]

67–804. Right of complaint—Inquiries by county board.—Any owner of property liable for taxation in the state shall have the right, in person or by his agent, to make complaint before the county board of equalization that other property or properties in the county have been assessed at less than the actual cash value thereof or at a less percentage of value than complainant's own

property. Upon such complaint being made before the board, it may hear any evidence or witness offered by the complainant, or may take such steps as it may deem material to the investigation of the complaint, and pass upon the question justly and equitably according to the standard herein established of an actual cash valuation of property. The board may inquire as to the valuation of the various classes of property in the respective districts and wards of the county, and make such changes by way of increase or decrease in the valuation as may be necessary to equalize the same as between the districts and wards, and to determine the rate per cent of increase or decrease to be added or deducted in order to make a just and equitable equalization in the respective districts and wards, so as to conform throughout the county to a just and equitable standard, which standard in such case shall not be less than the actual cash value of the property. [Acts 1907, ch. 602, § 32; Shan., § 802a7; Code 1932, § 1429.]

67–821. Right of complaint to state board of equalization.—Any taxpayer, or any owner of property subject to taxation in the state, shall have the right to a hearing and determination by the state board of equalization of any complaint he may make on the ground that other property than his own has been assessed at less than the actual cash value thereof, or at a less percentage of value than his own property or other property or that his own property has been assessed at more than its actual cash value, but such complaint shall be specific, in writing, and sworn to and filed with said board at least ten (10) days before the adjournment of the annual session. [Acts 1919, ch. 1, § 7; 1921, ch. 113, § 9; Shan. Supp., § 809a15; Code 1932, § 1450; modified.]

67–822. Determinations by state board—False statements.—Said board shall receive, and consider, all complaints and reports made to it, together with the evidence submitted therewith; and shall equalize, compute, and fix the value of all such properties within its jurisdiction by the standard of the actual cash value of same, and, for said purposes, said board shall have the power, and it is made its duty to reduce or increase, values of property so that the values of all assessments when so equalized shall conform to said standard of actual cash value. Equalization of such properties may be made by said board, by reducing or increasing, the values thereof, by classification of property, or by wards, civil districts or counties or in such manner as will enable the board to justly and equitably equalize assessments in conformity with said standard. A false statement of fact, either in an affidavit or deposition made or taken under the provisions of §§ 67–821—67–830, to be filed with, and acted upon by said board or said commissioner, shall be perjury, and the one guilty punished therefor, as in other cases of perjury. [Acts 1919, ch. 1, § 8; 1921, ch. 113, § 10; Shan.Supp., § 809a16; Code 1932, § 1451.]

67–823. Jurisdiction of state board—Finality of decisions.—Said state board shall have jurisdiction of, and it shall be its duty, to equalize during its session the assessments of all properties in the state, including any appeals which may be filed by merchants from the action of the commissioner of finance and taxation. The action of the state board shall be final and conclusive as to all matters passed upon by said board, subject to judicial review; and such taxes shall be collected upon the valuation found and fixed by said board. [Acts 1919, ch. 1, § 10; 1921, ch. 113, § 14; 1923, ch. 7, § 25; Shan.Supp., § 809a21; Code 1932, § 1456; impl. am. Acts 1937, ch. 33, § 50.]

67–928. Review of assessments by board of equalization.—The state board of equalization shall proceed to examine said assessments so made by the commission, and they are authorized to increase or diminish the valuation placed upon any property valued by said commission, and are further authorized to require of said commission any additional evidence touching one (1) or more of the properties assessed, and shall consider such additional evidence so furnished in fixing the correct value of any property so assessed, and said assessments shall not be deemed complete until corrected and approved by the said board of equal-

ization; and the governor is authorized to call said commission at any time to perform the duties imposed upon them; provided, however, that if said board of equalization shall so desire, they shall have the power without referring any assessment to said commission, themselves to employ experts, accountants, and to call witnesses to testify upon any assessment certified to them by said railroad and public utilities commission; and said board of equalization shall have the same powers to compel attendance of witnesses, production of books, papers, and documentary evidence as is by this chapter given to said commission. Said board of equalization shall have the right to call upon the interstate commerce commission for any valuations of property in the office of the interstate commerce commission and evidence in possession of said commission in support of such valuations.

All of the evidence thus acquired by said board of equalization shall be considered by them in addition to the evidence transmitted to said board by said commission in support of the assessment so fixed by said commission.

Any expense incurred by said board in calling for the additional proof as to the value of any property certified to them by said commission shall be by said board of equalization certified to the director of accounts and paid by him out of any moneys in the treasury not otherwise appropriated. [Acts 1919, ch. 3, § 10; 1920 (E.S.), ch. 18, § 1; impl. am. Acts 1923, ch. 7, §§ 19, 25; Shan.Supp., § 859a82; mod. Code 1932, § 1534; impl. am. Acts 1937, ch. 33, §§ 24, 29.]

67–929. Certification by board of equalization to commission—Payment and refund of excessive tax.—On or before the third Monday in October, said board of equalization shall certify to the commission the valuation fixed by it upon each property assessed under this chapter, and the action of the board of equalization in fixing the valuation upon such property shall be conclusive and final and the valuation so fixed shall be assessed against said property and the taxes due thereunder be paid. Provided, that if

any railroad or public utility has been or shall hereafter be aggrieved at the assessment so fixed and certified by the board of equalization, such railroad or public utility shall be required to pay the taxes due and owing the state, the counties and municipalities, upon the full value of said assessment, under protest, and upon termination of any proceedings that may be instituted in any of the courts of this state or in any of the courts of the United States of America by such railroad or public utility to review such assessment, the state, the counties and municipalities, and any school district, road district, or other taxing district to which such taxes have been paid, shall refund in cash and with interest, such part of the taxes so paid to them as may be adjudged to be excessive or illegal by any final decree or order entered in any such proceeding, or in default of such refund, such railroad or public utility is authorized to take credit for the amount of such illegal or excessive tax with interest against any tax thereafter becoming due from and payable by such railroad or public utility, to the state, or any county, municipality, road district, school district, or any other taxing district authorized by law to levy taxes. [Acts 1919, ch. 3, § 11; 1921, ch. 39, § 1; Shan.Supp., § 859a83; Code 1932, § 1535; Acts 1939, ch. 7, § 1; C.Supp. 1950, § 1535.]

27–801. Constitutional basis.—The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy. [Code 1858, § 3123 (deriv. Const.1834, art. 6, § 10); Shan., § 4853; Code 1932, § 8989.]

## APPENDIX C

### CURRENT TENNESSEE STATUTES

67–806. Complaints to county boards—Grounds.—(a) Any owner of property liable for taxation in the state shall have the right in person, or by his agent, to make complaint before the county board of equaliza-

tion on one or more of the following grounds:

(1) Property owned by the taxpayer has been erroneously classified or subclassified for purposes of taxation.

(2) Property owned by the taxpayer has been assessed on the basis of an appraised value that is more than the basis of value provided for in § 67–606.

(3) Property other than property owned by the taxpayer has been assessed on the basis of appraised values which are less than the basis of value provided for in § 67–606.

Upon such complaint being made before the county board, it may hear any evidence or witness offered by the complainant, or may take such steps as it may deem material to the investigation of the complaint.

(b) Any local governmental entity shall have the right to make a complaint before the assessor of property and county board of equalization on the value of property within the local governmental entity on one or more of the following grounds:

(1) The property has been erroneously classified or subclassified for purposes of taxation.

(2) The property has not been included on the assessment lists.

(3) The property has been assessed on the basis of appraised values which are less than the basis of value provided for in § 67–606.

Upon complaint by the local governmental entity, the county board of equalization shall give the property owner at least five (5) days' notice of a hearing to be held before said board, said notice shall be sent by U.S. mail to the last known address of the property owner.

(c) The county board may hear any evidence or witnesses offered by the local governmental entity or owner or may take such steps as it may deem material to the investigation of the complaint. [Acts 1973, ch. 226, § 10; 1974 (Adj.S.), ch. 644, § 2; 1975, ch. 171, § 13.]

67–810.   Appeal of county board action to state board authorized.—Any taxpayer, or any owner of property subject to taxation in the state, who is aggrieved by any action taken by the county board of equalization or other local board of equalization shall have the right to a hearing and determination by the state board of equalization of any complaint he may make on any of the grounds provided for in § 67–806. Said taxpayer or owner must first make complaint and appeal to the local board of equalization unless he shall not have been duly notified by the assessor of property of an increase in his assessment or change in classification as provided for in §§ 67–627, 67–628. All complaints and appeals to the state board of equalization must be specific, in writing, and sworn to and filed with the executive secretary of said board on or before August 1st of the year in which the appeal is prosecuted.

Further, the assessor of property or taxing jurisdiction shall also have the right to appeal from any action of the local board of equalization to the state board of equalization in the same manner as provided above. [Acts 1973, ch. 226, § 10.]

67–831.   Jurisdiction and duties of state board—Assessment appeals commission powers and duties.—(a) The state board of equalization shall have jurisdiction over the valuation, classification and assessment of all properties in the state. Said board shall have and perform the following duties:

(1) Receive, hear, consider, and act upon complaints and appeals made to the board;

(2) Hear and determine complaints and appeals made to the board concerning exemption of property from taxation;

(3) Take whatever steps it deems are necessary to effect the equalization of assessments, in any taxing jurisdiction within the state in accordance with the laws of the state; and

(4) Carry out such other duties as are required by law.

(b) In addition to the powers and duties conferred upon the state board of equalization by paragraph (a) of this section or any

other provision of this Code, the state board of equalization may by resolution create an assessment appeals commission consisting of not less than three (3) nor more than five (5) members, and may delegate to such assessment appeals commission the jurisdiction and duties conferred by law upon the state board of equalization to hear and act upon all complaints and appeals regarding the assessment, classification and value of property for purposes of taxation, including appeals and complaints from assessments made by the Tennessee Public Service Commission, complaints and appeals from actions of local boards of equalization and complaints and appeals concerning exemption of property from taxation. The assessment appeals commission authorized by this paragraph (b) shall be composed and shall function as follows:

(1) The members of the assessment appeals commission shall be appointed by the state board of equalization. Persons who may be appointed to the assessment appeals commission shall be residents of the state and at least eighteen (18) years of age. Members of the state board of equalization, the executive secretary of the state board of equalization, the director of the division of property assessment and local and state officials shall not be precluded from appointment to the said assessment appeals commission by virtue of their positions. At least one (1) of the members shall be a person other than a full time state official.

(2) The state board of equalization shall designate the chairman of the assessment appeals commission.

(3) The members of the assessment appeals commission shall take office for a term of one (1) year and until their successors shall take office.

(4) In the event that there is a vacancy in the membership of the assessment appeals commission, the state board of equalization shall fill the vacancy in the same manner as initial appointments.

(5) The assessment appeals commission shall meet at the call of the executive secretary to the state board of equalization. A majority of the members of the assessment appeals commission shall constitute a quorum.

(6) The assessment appeals commission shall follow such rules and regulations of practice and procedure which may be promulgated by the state board of equalization.

(7) It shall be the duty of the members to discharge the duties of the assessment appeals commission without compensation except that persons who are not officials of the state of Tennessee, who may from time to time serve as members of the assessment appeals commission shall be paid at the rate of fifty dollars ($50.00) per day for each day or part of a day in attendance at meetings of the assessment appeals commission. The members, whether or not they are state officials, shall be reimbursed necessary travel and per diem expenses as prescribed in comprehensive travel regulations by the commissioner of finance and administration for employees of the state of Tennessee, during such service on the assessment appeals commission.

(8) At any time prior to, during or after any proceeding before the assessment appeals commission, authorized by this paragraph (b), it may certify a question to the state board of equalization if such question is determinative or partially determinative of the proceeding and if such question is found by the assessment appeals commission to be a matter of policy to be determined by the state board of equalization. Proceedings before the assessment appeals commission may be suspended pending the determination of the question certified to the state board of equalization.

(9) Actions taken by the assessment appeals commission shall be final as if the actions were taken by the state board of equalization; provided, however, that the state board of equalization may, in its sole discretion, within thirty (30) days of any final action taken by the assessment appeals commission, enter an order requiring a review of the action of the assessment appeals commission by the state board of equalization, in which the action shall not

become final until the state board of equalization has rendered its final decision in the matter. In the event that the state board of equalization does exercise its discretion to review any action of the assessment appeals commission, said review may be upon the record before the assessment appeals commission or in such manner as the state board shall direct.

(10) If the state board of equalization shall not exercise its discretion to review a matter heard by the assessment appeals commission, the assessment appeals commission shall issue a certificate of assessment or other final certificate of its actions, which certificate shall be subject to judicial review in the same manner as are final actions of the state board of equalization.

(11) The assessment appeals commission shall prepare and maintain records of its proceedings in the form of minutes. The said minutes, together with all other papers and records of the assessment appeals commission, shall be kept and maintained in the office of the executive secretary to the state board of equalization. [Acts 1973, ch. 226, § 10; 1975, ch. 171, § 1.]

67–838. Equalization action by state board.—Upon its consideration of reports made to it, together with the evidence submitted therewith, or other information available, the state board or the assessment appeals commission if such has been created by the state board under § 67–831 shall take whatever steps it deems are necessary to effect the assessment of property in accordance with the constitution of Tennessee and the laws of the state. Equalization may be made by said board or commission as the case may be by reducing or increasing the appraised values of properties within any taxing jurisdiction, or any part thereof, in such manner as is determined by the state board of equalization will enable said board or commission to justly and equitably equalize assessments in accordance with law.

In the event that the state board of equalization or the assessment appeals commission as the case may be deems it necessary to increase or decrease appraised values of properties of any taxing jurisdiction, or any part thereof, in any manner whereby its action affects properties in general rather than individual properties, it is not necessary that the state board or the assessment appeals commission as the case may be notify each individual property owner as provided in § 67–839; provided, however, said board or commission shall cause to be published at least once, in a newspaper of general circulation within such taxing jurisdiction affected by the action of said board or commission, a notice of said action of the state board or the assessment appeals commission as the case may be. [Acts 1973, ch. 226, § 10; 1975, ch. 171, § 8.]

67–840. Action of state board final—Judicial review.—The action of the state board shall be final and conclusive as to all matters passed upon by said board, subject to judicial review, and taxes shall be collected upon the assessments determined and fixed by said board. [Acts 1973, ch. 226, § 10.]

67–932. Review of assessments by state board.—The state board of equalization shall proceed to examine said assessments as made by the commission, and they are authorized to increase or diminish the valuation placed upon any property valued by said commission, and are further authorized to require of said commission any additional evidence touching one or more of the properties assessed, and shall consider such additional evidence so furnished in fixing the correct value of any property so assessed, and said assessments shall not be deemed complete until corrected and approved by the said board of equalization; and the state board of equalization is authorized to call said commission at any time to perform the duties imposed upon them; provided, however, that if said board of equalization shall so desire, they shall have the power without referring any assessment to said commission, themselves to employ experts, accountants, and to call witnesses to testify upon any assessment certified to them by said commission; and said board of equalization shall have the same powers to compel attendance of witnesses, production of

books, papers, and documentary evidence as is by this chapter given to said commission. Said board of equalization shall have the right to call upon the interstate commerce commission for any valuations of property in the office of the interstate commerce commission and evidence in possession of said commission in support of such valuations.

All of the evidence thus acquired by said board of equalization shall be considered by them in addition to the evidence transmitted to said board by said commission in support of the assessment so fixed by said commission.

Any expense incurred by said board in calling for the additional proof as to the value of any property certified to them by said commission shall be by said board of equalization certified to the commissioner of finance and administration and paid by him out of any moneys in the treasury not otherwise appropriated. [Acts 1973, ch. 226, § 11.]

67–933. Certification of valuation to commissioner.—On or before the third Monday in October, said board of equalization shall certify to the commission the valuation fixed by it upon each property assessed under this chapter, and the action of the board of equalization in fixing the valuation upon such property shall be conclusive and final and the valuation so fixed shall be assessed against said property and the taxes due thereunder be paid. Provided, that if any railroad or public utility has been or shall hereafter be aggrieved at the assessment so fixed and certified by the board of equalization, such railroad or public utility shall be required to pay the taxes due and owing the state, the counties, and municipalities, upon the full value of said assessment, under protest, and upon termination of any proceedings that may be instituted in any of the courts of this state or in any of the courts of the United States of America by such railroad or public utility to review such assessment, the state, the counties, and municipalities, and any school district, road district, or other taxing district to which such taxes have been paid, shall

refund in cash and with interest, such part of the taxes so paid to them as may be adjudged to be excessive or illegal by any final decree or order entered in any such proceeding, or in default of such refund, such railroad or public utility is authorized to take credit for the amount of such illegal or excessive tax with interest against any tax thereafter becoming due from and payable by such railroad or public utility, to the state, or any county, municipality, road district, school district, or any other taxing district authorized by law to levy taxes. [Acts 1973, ch. 226, § 11.]